**TEXACO, INC., et al., Appellants,**

v.

**Annie LETTERMANN et al., Appellees.**

No. 7020.

Court of Civil Appeals of Texas.

Amarillo.

Feb. 6, 1961.

Rehearing Denied March 6, 1961.

Underwood, Wilson, Sutton, Heare & Berry, Amarillo, William S. Clarke, Houston, William P. Gibson, Dallas, Pat O. Johnson, Oklahoma City, Okl., for appellants.

E. M. Grimes, Taylor, for appellees.

DENTON, Chief Justice.

This suit was instituted by Annie Lettermann and others, appellees and plaintiffs below, against Texaco, Inc. and Kerr-McGee Oil Industries, Inc., in the nature of a declaratory judgment proceeding. The case involves the construction of an oil and gas lease which contained a lease pooling clause, executed by appellees and their predecessors in title, as lessors, to Texaco, Inc., as lessee. Both plaintiffs and defendants below filed motions for summary judgment. All the material facts involved in this controversy were stipulated and agreed upon by the parties. From a judgment granting appellees' motion for summary judgment, based upon appellees' allegations in count No. 1 of their first original amended petition, the appellants duly perfected this appeal.

Because of the complexity of the problems presented here, we deem it expedient to set out the facts of the case in some detail.

On September 28, 1938, appellees, or their predecessors in title, executed an oil and gas lease to Phillips Petroleum Company covering the N½ of Sec. 22, Block M–2, A. O. Campbell Survey in Moore County, Texas. The lease's primary term ended December 28, 1948 and contained a consolidation or lease pooling clause. This lease was subsequently assigned to the Texaco Company, now Texaco, Inc., one of the appellants here. On April 30, 1948, which was prior to the termination date of the lease and after Texaco became lessee, the termination date of the lease was extended to December 28, 1958. On September 10, 1952, Paragraph 8 of the lease (the lease pooling clause) was amended to permit a consolidation of a gas leasehold estate into a unit not to exceed 644.4 acres rather than 640 acres as provided for in the original lease. The lease pooling clause as amended reads as follows:

"8. The lessee is expressly granted the right and privilege to consolidate the gas leasehold estate or any part or parts thereof created by the execution and delivery of this lease with the gas leasehold estate or any part or parts thereof in lands adjacent or contiguous to the land herein described. Provided that in no event shall such consolidated leasehold estate exceed an area of 644.4 acres; and in the event lessee exercises such right and privilege the consolidated gas leasehold estate shall be deemed, treated and operated just as though the gas leasehold estates so consolidated were covered and included in this lease originally, and in such event the royalties payable hereunder shall be prorated, and paid to the respective lessors in the proportion that such lessors' acreage in the consolidated estate bears to the total acreage in such consolidated gas leasehold estate, and a producing well on any portion of the consolidated estate shall operate to continue the entire leasehold estate in the whole of the same for so long as gas is produced therefrom."

In January, 1953, Phillips Petroleum Company was owner of an oil and gas lease executed by Olive M. Neal et al. as lessors, covering the SE¼ of Sec. 22, Block M–2 in the same survey of Moore County, Texas. At the same time, Phillips Petroleum Company and Kerr-McGee, one of the appellants here, were the joint owners of a similar lease executed by G. M. Thaten et ux., as lessor, covering the SW¼ of the same section. These three oil and gas leases cover the entire Section 22 and each of the leases contained a pooling clause.

On January 2, 1953, Texaco, Phillips and Kerr-McGee executed and duly recorded a consolidation agreement pooling these three leases in a single gas leasehold estate covering the 644.4 acres in Section 22. This designated unit will be referred to as the 1953 Unit. During the month of January, 1953, a well was commenced on the N½ of Sec. 22 but the well was not productive and it was plugged and abandoned on February 21, 1953.

The primary term of the oil and gas lease covering the SE¼ of Sec. 22 ended February 12, 1953 and the primary term of the lease covering the SW¼ of Sec. 22 ended February 25, 1953. These two leases were not renewed or extended. The record shows that the two leases were released by the respective lessors by an instrument dated February 28, 1953. On November 27, 1957, the three named lessees executed an instrument which purported to terminate and rescind the consolidated gas leasehold unit here designated as the 1953 Unit.

Prior to November 27, 1957 and subsequent to February, 1953, Texaco became the owner of oil and gas leases covering the SW¼ of Sec. 22, the W½ of Sec. 431, Block 44 of the same survey, and 77 acres out of the Charles Aderholt Survey in addition to the lease of the N½ of Sec. 22 previously acquired by them. On November 27, 1957, Texaco executed and duly recorded an instrument designating a consolidated gas leasehold estate covering the south 80 acres of the W½ of the N½ of Sec. 22, the SW¼ of Sec. 22, the W½ of Sec. 431 and the 77 acres out of the Charles Aderholt Survey. This designation containing 638.1 acres will be referred to as the 1957 Unit. In January, 1958 Texaco commenced the drilling of a well on the south 80 acres of the W½ of the N½ of Sec. 22. This well was completed as a producing gas well on February 14, 1958 and has continued to be a producing gas well in paying quantities. It is to be noted that this 1957 Unit gas well is located on the appellees' tract and is also within the acreage designated as the 1957 Unit.

Prior to April, 1959 and subsequent to February, 1953 Kerr-McGee, appellant, became the owners of oil and gas leases covering the SE¼ of Sec. 22 and the E½ of Sec. 431. On April 7, 1959 the said Kerr-McGee and Texaco, Inc., designated a consolidated or unitized gas leasehold estate covering the NE¼ and the N½ of the NW¼ of Sec. 22 (lease owned by Texaco) and the SE¼ of said Sec. 22 and the E½ of Sec. 431, except the south 80 acres of the E½ of Sec. 431 (the leases on the latter two tracts were owned by Kerr-McGee). This designation containing 643.3 acres will be referred to as the 1959 Unit.

On May 13, 1959 Kerr-McGee commenced the drilling of a well on the SE¼ of Sec. 22 and it was completed on June 20, 1959 as a producing gas well in paying quantities. This well also continues to be a producing gas well in paying quantities. This well is located on acreage within the purported 1959 Unit, but not on acreage under appellees' lease. For clarification the three designated units described above are outlined and attached as exhibits.

Appellees alleged their various causes of action in three counts with counts Nos. 2 and 3 being alleged in the alternative. We shall briefly summarize appellees' various positions as alleged in the three counts as we understand them.

In count No. 1, appellees contend: that Texaco did not have power or authority to rescind the 1953 Unit; that once Texaco executed the 1953 Unit designation, Texaco exhausted the right to further consolidate the N½ of Sec. 22 with any other land; that by voluntarily abandoning the 1953 Unit by executing the termination instrument in November, 1957 the appellants are barred from exercising any right, authority, privilege or power with respect to the 1953 Unit; that the purported 1957 and 1959

Units are clouds on the appellees' title to minerals under the N½ of Sec. 22 and these purported Units should be declared null and void as to appelles' right, title and interest; and appellees prayed for a full ⅛th royalty on all gas produced on said N½ of Sec. 22.

By alternative count No. 2 which is conditioned on the contingency that the 1957 Unit is valid and binding on appellees, the appellees allege the appellees' lease has terminated as to all the N½ of Sec. 22, except the 80 acres placed in the 1957 Unit. It being appellees' alternative position that the primary term of the Lettermann lease ended on December 28, 1958, and that no drilling operations were performed on their land other than the south 80 acres thereof until May 13, 1959. That is to say, the purported 1959 Unit designation was not executed until April 7, 1959 and that the well located in the 1959 Unit was not commenced until May 13, 1959, both events taking place after the primary term of the appellees' lease ended on December 28, 1958.

By count No. 3 appellees further alternatively pleaded that the 1953 Unit rescission instrument dated November 27, 1957 as well as the instruments designating the 1957 and 1959 Units should be declared null and void and of no effect as to the appellees' right, title and interest in the N½ of Sec. 22. By this alternative plea, appellees in effect are ratifying the 1953 Unit and by so doing take the position that the rights of appellees are to be determined from the 1953 Unit designation only.

The trial court entered judgment substantially following appellees' allegations in count No. 1 and held in substance as follows: it overruled appellants' plea in abatement and special exceptions which urged lack of necessary and indispensable parties as to appellees' cause of action; sustained appellees' motion for summary judgment as it applied to count No. 1; that as to the right, title and interest of appellees, appellant Texaco did not have power or authority to rescind the 1953 Unit; that by executing the 1953 Unit designation

Texaco exhausted its right, privilege and authority under the appellees' lease to consolidate their land with any other leasehold estate; that by abandoning the 1953 Unit appellant relinquished any right under the 1953 Unit; declared the 1957 and 1959 Units null and void as to appellees' right, title and interest under appellees' lease; and awarded appellees the full ⅛th royalty from all gas produced from the N½ of Sec. 22. The trial court did not consider appellees' alternative counts Nos. 2 and 3 but the judgment treated these counts as if stricken from the petition without prejudice to appellees' right to reassert them in the event the judgment be set aside or reversed on appeal.

As we understand appellants' basic contention, they first urge that the 1953 Unit terminated with the abandonment of the well drilled in 1953 because the primary terms of the leases of the SE¼ and SW ¼ of Sec. 22 ended in the same month the well was abandoned. Appellants contend this dissolved or terminated the 1953 Unit. That these two leases did expire in February, 1953 can not be questioned. Based on this premise, appellants contend the formation of the 1957 and 1959 Units were authorized under the terms of the pooling clause of the appellees' lease. The first question to be decided here is what effect did the expiration of the two leases have on the 1953 Unit.

Counsel for the parties here concede this and other questions raised in this case have not been passed on by our courts. Thus in several respects the case before us is one of first impression.

■ For a consolidated or a unitized unit to exist, it must be made up of two or more leases which are in full force and effect. We think it is clear that the lessors of the SE¼ and SW¼ of Sec. 22 could not be bound by the terms of the lease pooling clause in their lease after the leases had expired. If no drilling operations were being conducted and no gas was being produced from any lease within the 1953 Unit,

the terms of the leases themselves must govern. With two of the three leases making up the 1953 Unit terminating by their own terms, we fail to see how the unit could survive. A unitized unit is wholly dependent upon existing mineral leases. No case has been cited which supports a rule of law that holds that once a unitized lease-hold unit has been designated, the consolidated unit remains in full force and effect so long as any one leasehold estate therein remains in full force and effect. We are unwilling to so hold here.

■ In Trawick v. Castleberry, 275 P. 2d 292, 294, the Oklahoma Supreme Court had before it an issue of termination of a pooled unit, but the court's decision went off on other issues, and did not by specific language decide the termination issue. There plaintiff's 80 acres was leased in February, 1944 for a term of five years. The 80 acres was located in the SE part of the described SE¼ section. Shortly after the lease was executed, a paying gas well was completed on the NW¼ of the SE¼ on lands not covered by plaintiff's lease. In September, 1944, the entire SE¼, including plaintiff's land, was communitized for the production of gas in order to comply with orders of the Petroleum Administrator for War. Prior to September, 1945, oil was discovered in the gas well and thereafter oil was produced instead of gas. In the same month, a second communitized unit was formed by the lessee which covered the NW¼ of the SE¼ which included only 7 acres of plaintiff's land. Thereafter plaintiff filed the suit asking that the lease as to the 73 acres outside of the second unitized unit be terminated. Plaintiff contended the second communitized area constituted a novation; that when gas was no longer produced the first unitized area ceased to operate and terminated the pooling of the 73 acres not included in the second unit. In view of other aspects of the case, the court indicated such a contention was irrelevant, but used the following language in reply to plaintiff's contention:

"Both declarations were executed during the primary term of the lease; and it is not contended, and the record does not show, that lessees were required to keep a declaration of communitized area in force at all times." The court seems to concede that the first unit terminated, but the authority or power of the lessees to designate the second communitized unit was not questioned by either the plaintiff or the court. Under the facts and circumstances before us, we are therefore of the opinion the 1953 Unit terminated in February, 1953.

■ If we are correct in holding the 1953 Unit was terminated, we must determine whether or not appellants' right to further pool or consolidate the appellees' lease was exhausted. The appellees' lease pooling clause provided: "The lessee is expressly granted the right and privilege to consolidate the gas leasehold estate or any part or parts thereof created by the execution and delivery of this lease with the gas leasehold estate or any part or parts thereof in lands adjacent or contiguous to the land herein described * * *." Neither counsel has cited nor have we been able to find a case that has passed on this particular question. In determining whether or not lessees' power to pool leases has been exhausted, the courts look to the good faith of the lessee as well as to the lease pooling clause itself. No specific language is found in the pooling clause before us which either permits or prohibits the lessee from exercising these rights a second or subsequent time. No such phrase as "at any time" or "from time to time" is found in the pooling clause of the appellees' lease. The Oklahoma Supreme Court in Imes v. Globe Oil & Refining Co., 184 Okl. 79, 84 P.2d 1106, 1107, considered the question of the lessee having authority to pool leases "at any time." The court there construed this phrase to mean within a reasonable time under the circumstances. The question of lessee's authority to designate another pooled unit was not involved in the Imes case,

but the court there went further and held that the lessee in such a circumstance was "virtually the agent of the lessors and for this reason he was bound to use good faith." Appellees here urge that the absence of such phrases as "at any time" or "from time to time" indicates the intention of the parties to limit such pooling designation to one designated unit. They further contend the language of the clause before us is ambiguous and therefore it should be construed more strictly against lessees who prepared the lease. We do not believe the omission of such phrases should be given such effect, neither do we agree that the clause as written is ambiguous. We must determine the intention of the parties at the time the lease (including the pooling clause) was executed.

That pooling or unitizing of oil and gas leases is a standard practice in the industry can not be questioned. It is equally recognized that unitization is often a more feasible method of operation from an engineering and scientific point of view. Unitization can be said to be advantageous to both lessors and lessees. We think these facts lead to the conclusion that in the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense. The United States Court of Appeals, 10th Circuit, in Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 933 was considering a unitization provision in a mineral lease. In such a situation the court held the relationship between the lessor and lessee was analogous to that between principal and agent and cited Imes v. Globe Oil & Refining Co., 184 Okl. 79, 84 P.2d 1106. The court further held that the pooling clause "is in the nature of a power coupled with an interest, and is, therefore, irrevocable." Such language, together with the conclusions reached by the courts, indicates the power to pool leases by the lessee should be given broad powers limited by the duty owed by the agent to exercise a high degree of good faith and loyalty for the furtherance and advancement of the interest of

the principal. Appellants have shown good faith in including appellees' leased acreage in two different unitized designations, and have completed a producing gas well on each of the two units. These two wells entitle appellees to their proportionate share of the royalties from each of the two consolidated units, even though one of the wells is not on the land leased by appellees. Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43. We therefore conclude the right of the appellants to pool appellees' acreage with other leasehold estates was not exhausted by the act of designating the 1953 Unit. Appellees' primary lease (including the pooling clause) remained in full force and effect and the lessees' rights to unitize with other contiguous land is limited only by the terms of the lease itself.

Being of the opinion the 1953 Unit was terminated and appellants had the authority to further unitize after the designation and termination of the 1953 Unit, we are of the opinion it logically and necessarily follows that the 1957 Unit is a valid and subsisting unit under the appellees' pooling clause. The 1957 Unit was designated prior to the expiration of the appellees' lease and a producing well was completed prior to that time. This well being located on the 80 acres out of appellees' lease had the effect of extending the appellees' lease as well as other leases within the 1957 Unit.

To determine whether or not the 1959 Unit was a valid consolidated unit, we must decide what effect the 1957 Unit gas well had on the remaining 242.2 acres of the appellees' lease which was outside of the 1957 Unit. This question was considered in Scott v. Pure Oil Co., 5 Cir., 194 F.2d 393. There an original lease covered 317.93 acres which was later amended so as to grant lessee the right to pool the lease or any portion thereof with other leases to form one or more units. A gas unit was formed which included 140 acres of the original lease and a producing gas well was completed on the unit (but not on the 140 acres) prior to the expiration of the primary term

of the lease. The lessor filed suit asking that at the expiration of the primary term the lease be terminated as to the land lying outside of the pooled unit. The pooling clause provided, as in the clause before us, that the entire acreage so pooled into a unit be treated for all purposes except for payment of royalties as if it were included in the lease, and that gas produced from a unit be treated as if production were from land covered by the lease whether or not the well was located on the land covered by the lease. The court there concluded the lease was perpetuated in its entirety (including acreage within the unit and acreage without the unit) by production from any location within the unit. This same conclusion was reached in Trawick v. Castleberry, supra. We therefore hold that the entire acreage of the appellees' lease was perpetuated by the 1957 Unit gas well. Thus, if the remaining acreage of appellees' lease (outside the 1957 Unit) was in force and effect, appellants were empowered by the pooling clause to designate the 1959 Unit. There is no question but that this unit designation complied with the terms of appellees' lease as it was made up of contiguous land, did not exceed 644.4 acres, and included a portion of appellees' leased acreage. We therefore conclude that the 1959 Unit is a valid and subsisting consolidated unit.

We now consider appellees' count No. 2 which was pleaded in the alternative. As indicated above, this count is conditioned on the premise that the 1957 Unit is valid and effective as to appellees' right, title and interest. Here appellees take the position that at the expiration of the primary term of the appellees' lease (December 28, 1958), there being no drilling operations or production on the land other than the south 80 acres in the 1957 Unit, the lease as to the remaining 242.2 acres in the N½ of Sec. 22 expired and can not be included in the 1959 Unit. We can not agree with appellees' contention. The lease pooling clause ends with the following language: "* * * and a producing well on any

portion of the consolidated estate shall operate. to continue the entire leasehold estate in the whole of the same for so long as gas is produced therefrom." This language is clear and unambiguous. In following the reasoning of Scott v. Pure Oil Co., supra, which pooling clause was similar to the clause before us, we hold that production on the unitized 1957 Unit fulfilled the requirement for production in the original lease of appellees and that the terms were perpetuated upon the entire acreage covered by the lease.

Appellees' other alternative plea asserts the 1953 Unit remained in full force and effect and that they are entitled to ½ of the ⅛th royalty from the two producing wells in the original 1953 Unit. Having previously held the 1953 Unit was terminated, the position of appellees in count No. 3 is without merit. Based on the conclusions expressed, appellants' points of error 5 through 15 are sustained.

In view of our disposition of this case we deem it unnecessary to discuss in detail appellants' points of error dealing with the trial court overruling appellants' plea in abatement and special exceptions which urged lack of necessary and indispensable parties. However, our view is that if the 1957 and 1959 Units were to be declared null and void as to the appellees' interest as they do seek in count Nos. 1 and 3, this would have the effect of necessarily freeing appellees' land from these unitized units. In spite of appellees' argument to the contrary, we can not comprehend how, in such a situation, the other royalty owners' interest could not be affected. It seems clear that the rule laid down as to necessary parties in Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472 and Belt v. Texas Co., Tex.Civ. App., 175 S.W.2d 622 (writ refused) would control in the case before us. Therefore if the 1957 and 1959 Units were to be declared null and void as to appellees' interest, which we do not so hold, the royalty owners under the other leases in the two unitized units would have such a royalty interest in the appellees' lease to make them necessary

and indispensable parties. However, this holding becomes immaterial in view of our disposition of the case. For the foregoing reasons the judgment of the trial court is reversed and judgment is here rendered that appellees take nothing.

Reversed and rendered.