In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00092-CR


______________________________




JAMES ALFRED SINGLETON, JR., Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 8th Judicial District Court


Delta County, Texas


Trial Court No. 6686




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 On September 12, 2005, James Alfred Singleton, Jr. pleaded guilty to committing the offense
of retaliation. See Tex. Penal Code Ann. § 36.06 (Vernon Supp. 2006). The trial court accepted
Singleton's plea and found the evidence substantiated his guilt; but, pursuant to a negotiated plea
agreement, the trial court deferred a finding of guilt and released Singleton to community supervision
for a period of two years. On November 17, 2005, the State filed an application to proceed with an
adjudication of guilt in the underlying matter. This application was amended on January 25, 2006. 
The trial court subsequently adjudicated Singleton's guilt and assessed his punishment at ten years'
imprisonment. 

 Singleton now appeals, asserting he received ineffective assistance of counsel during either
the original guilty plea proceeding or during the adjudication proceeding because his trial counsel
should not have allowed him to either plead guilty to the original crime or plead "true" to violating
the terms and conditions of his community supervision agreement with the trial court. We, however,
have determined that we need not reach the issue presented in as much as another issue--a
jurisdictional bar--prevents our resolving Singleton's point of error.

 The record before us shows Singleton affirmatively waived his right to appeal the trial court's
judgment revoking community supervision. In this waiver, Singleton states he understands his
appellate rights, but he prefers to "accept as final the judgment of conviction and sentence . . . ." 
Singleton also requests that he "be allowed to commence serving the same without further
delay . . . ." 

 The Texas Court of Criminal Appeals recently affirmed that "a valid waiver of appeal,
whether negotiated or non-negotiated, will prevent a defendant from appealing without the consent
of the trial court." Monreal v. State, 99 S.W.3d 615, 622 (Tex. Crim. App. 2003). Such is the case
here. The record before us affirmatively demonstrates Singleton neither sought nor obtained the trial
court's permission to appeal. The waiver itself demonstrates he knowingly, intelligently, and
willingly waived his right to appeal. Accordingly, we must conclude that Singleton's waiver of
appeal is binding and deprives this Court of jurisdiction to consider his point of error. Accord id.
at 623.

 For the reasons stated, we dismiss Singleton's appeal.



 Bailey C. Moseley

 Justice


Date Submitted: April 3, 2007

Date Decided: April 10, 2007


Do Not Publish



____________________


WAGNER & BROWN, LTD., ET AL., Appellants
 
V.
 
JANE TURNER SHEPPARD, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF SYBIL TURNER, DECEASED, Appellee


                                              

On Appeal from the 115th Judicial District Court
Upshur County, Texas
Trial Court No. 486-97


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Jane Turner Sheppard, individually and as independent executrix of the estate of
Sybil Turner, deceased, brought suit against Wagner & Brown, LTD., C. W. Resources,
Inc., Thompson Interests, Inc., Carl Westerman, Westerman Royalty Company, Bernie
Wolford, ONEOK Texas Energy Holdings, L.L.C., ONEOK Texas Energy Resources, L.P.,
and Laura Jane Westerman, independent executrix of the estate of H. G. Westerman,
deceased (collectively, "Wagner"). Sheppard sued for declaratory relief and for damages
after her oil and gas lease terminated and Wagner sought to account to her for her
unleased mineral interest on a pooled unit basis and to deduct certain costs and expenses
from her share of production. After ruling on motions for partial summary judgment filed
by both sides, the trial court conducted a bench trial and rendered a final judgment in favor
of Sheppard from which Wagner now appeals.


 We affirm. 
BACKGROUND
          In July 1994, Sheppard signed an oil and gas lease in favor of C. W. Resources,
Inc., covering her undivided one-eighth mineral interest in a 62.72-acre tract of land for a
primary term of three years and reserving a one-fourth royalty. In September 1996,
Wagner created the W. M. Landers Gas Unit, ultimately made up of approximately 122
acres. Pursuant to the terms of the lease, Sheppard's mineral interest was pooled in this
unit. Wagner drilled the Landers No. 1 Well on the 62.72-acre tract and, in October 1996,
began to produce and sell gas condensate from that well. Under the terms of Sheppard's
lease, the first royalty payment was due within 120 days of the first sale of oil and gas
produced from the unit. Sheppard failed to receive such a payment and her lease
terminated. Wagner then drilled the Landers No. 2 Well on the 62.72-acre tract and began
to produce and sell gas and condensate from that well in September 1997. Both the
Landers No. 1 Well and the Landers No. 2 Well are physically located on the tract in which
Sheppard owns an undivided one-eighth mineral interest.
          Before Sheppard's lease terminated, she was paid for her share of production based
on the terms of the lease, i.e., a royalty payment of one-fourth of one-eighth, free of the
costs of production. After her lease terminated, Wagner paid Sheppard co-tenant revenue
(one-eighth), rather than a simple royalty, but still diluted by the pooling unit. Further,
Wagner sought to recoup from Sheppard one-eighth of the prior drilling and operating
expenses on Landers No. 1 and sought to deduct from Sheppard's share of production
certain leasehold, land/legal, and overhead expenses in developing the unit. Wagner also
sought to account to Sheppard for her share of the costs of drilling the two wells on an
aggregate basis, rather than on a well-by-well basis. 
          Sheppard sued Wagner for the failure to pay her full one-eighth interest, undiluted
by the pooling unit, and for the alleged improper deduction of expenses from her share of
production. Sheppard also sought declaratory relief regarding, among other things, the
nature of the parties' relationship after termination of her lease, whether she was bound
by the pooled unit after termination of her lease, the deduction of certain expenses, and
whether Wagner must account to her on a well-by-well basis, as opposed to an aggregate
basis. 
          Sheppard filed motions for partial summary judgment and Wagner filed cross-motions for partial summary judgment. The trial court signed an order granting Sheppard's
motions and denying Wagner's. In the order, the trial court held that the parties' lease
terminated March 1, 1997, and that, on termination, the parties' relationship became a co-tenancy.


 The court further held that: (1) Sheppard is entitled to a full one-eighth unleased
mineral interest in the two wells; (2) Sheppard is entitled to receive from the Landers No.
1 Well an undivided one-eighth of the net revenues attributable to her unleased mineral
interest from and after March 1, 1997; (3) Wagner is only entitled to recoup out of
Sheppard's one-eighth of the revenues from the Landers No. 1 Well, one-eighth of the
necessary and reasonable costs of producing and marketing the minerals from such well
that were actually incurred after March 1, 1997; (4) Wagner is only entitled to recoup from
Sheppard the costs of producing and marketing of minerals from the Landers No. 2 Well
by deducting, from Sheppard's one-eighth of the revenues from the Landers No. 2 Well,
one-eighth of the necessary and reasonable costs of producing and marketing the minerals
from  the  Landers  No.  2  Well  that  were  actually  incurred  by  Wagner  from  and  after
March 1, 1997; (5) Wagner must account to Sheppard for her unleased mineral interest
on a tract basis and not a pooled unit basis; (6) Wagner cannot recoup from Sheppard any
of the capital costs or expenses for drilling, testing, completing, or equipping either well that
were incurred before March 1, 1997; and (7) Wagner must account to Sheppard for her
share of the net revenues from the two wells on a well-by-well basis, not on an aggregate
basis.  
          The parties then entered into a stipulation regarding Sheppard's damages under
various scenarios, depending on how the trial court ultimately resolved whether Wagner
could deduct certain expenses from Sheppard's share of production. The parties also
stipulated to interest for unpaid production and Sheppard's reasonable and necessary
attorney's fees. 
          The trial court then held a bench trial on damages, whether Wagner could deduct
leasehold, land/legal, and overhead expenses from Sheppard's share of production, and
Sheppard's attorney's fees. At the end of trial, the court rendered judgment awarding
Sheppard $227,189.68 in damages, attorney's fees totaling $37,624.51, conditional
appellate attorney's fees, interest on the value of Sheppard's proportionate share of unpaid
revenues totaling $39,775.50, and postjudgment interest. The court rejected Wagner's
efforts to deduct leasehold, land/legal, and overhead expenses from Sheppard's share of
production. The trial court's judgment is supported by findings of fact and conclusions of
law, as well as the parties' damages stipulations.
          In this appeal, Wagner contends the trial court erred in (1) holding that Sheppard's
mineral interest is no longer bound by or subject to the pooled unit; (2) holding that Wagner
can only recoup from Sheppard one-eighth of the capital costs or expenses on the Landers
No.1 Well that were incurred after termination of the lease; (3) holding that Wagner cannot
deduct leasehold, land/legal, and overhead expenses from Sheppard's one-eighth share
of the production revenues attributable to both wells; and (4) holding that Wagner must
account to Sheppard for her share of the net revenues from the two wells on a well-by-well
basis, rather than an aggregate basis.
Is Sheppard's Interest Still Subject to the Pooled Unit? 
     
          The first issue is whether, after the termination of Sheppard's lease, her mineral
interest is still subject to the pooled unit. Wagner contends that it entered into the pooling
agreement on Sheppard's behalf while it had authority to do so and that, just because the
lease ended, does not mean the pooling agreement ended. The result, according to
Wagner, is that it should continue to make payments to Sheppard as required by the
pooling agreement, but in the amount required by her co-tenancy, rather than the lease. 
Sheppard responds that, since the underlying lease was the only thing giving Wagner the
authority to enter a pooling agreement, when that lease terminated, fee-simple absolute
in the mineral estate reverted to her and the pooling agreement also terminated as to her
interest. The result, according to Sheppard, is that she does not get the lower percentage
of the production under the pooling agreement—she gets the full one-eighth to which she
is entitled as the mineral owner of the property on which the well is drilled. 
          We have been unable to find anything in Texas caselaw directly on point to control
our analysis. There are cases providing some guidance, although little clarity. 
          In Ladd Petroleum Corp. v. Eagle Oil and Gas Co., 695 S.W.2d 99, 106 (Tex.
App.—Fort Worth 1985, writ ref'd n.r.e.), the court defined the underlying issue as requiring
it to determine under what circumstances a pooling unit terminated. Id. at 100. There
were three tracts involved, Woody, Blair, and Fulks. Production was on the Woody tract. 
Ladd accidentally released the Woody tract—and promptly leased the property again after
discovering the "mistake." When Blair and Fulks discovered their pooled property was held
for a time by production on a terminated lease, they demanded freedom from the unit.
          The Fort Worth court reasoned in Ladd that, even though the leasehold over the
producing property was eliminated by the release, the specific language of the lease
authorized the lessee to "pool the . . . interest with other 'lands, lease or leases.'" Id. at
106. The court concluded the unit still existed as to the other two properties because the
lessee was
not restricted to pooling the Blair leases with an existing leasehold estate,
and the continuing validity of any such pooling was not dependent upon a
subsisting leasehold estate in the adjacent land. Furthermore, the Blair
leases were to remain in effect so long as gas was produced from "land with
which" the Blair land was pooled, as opposed to "leasehold estate." Since
this language provides that the Blair leasehold estates need not have been
pooled with another leasehold estate to create a unit, the continued
existence of an already viable unit does not hinge on the presence of the
other leasehold estate. The termination of the other leasehold estate
because of release does not in and of itself terminate the unit.

Id. 
          The court then discussed the right to terminate a pooling agreement and concluded
that, under the language of the leases at issue, the power to "unpool" was not vested in
the lessee, but remained the purview of the lessor, even though the lessee did have
authority to agree to pool the property initially. It is also clear that the parties seeking to
dissolve the unit were parties to binding leases.
          Ladd is instructive, but is far different from the instant case in one important respect:
in Ladd, the litigants were attempting to terminate the entire pool—or perhaps obtain a
declaration that, when one pool participant is no longer in the pool, then the pool ceases
to exist. Here, Sheppard merely insists that her participation in the pool has terminated,
not that the entire pool has terminated. 
          Ladd would be on point if, after Sheppard's lease terminated, she had leased her
interests to Wagner again and then one of the adjoining landowners demanded freedom
from the unit. For purposes of this case, Ladd tells us no more than a pooling unit does
not cease to exist when one of its members (even the member providing the production)
is no longer properly leased—so long as the lease of the other members does not require
the property to be pooled with other "leased" property.
          In an older case, Texaco, Inc. v. Lettermann, 343 S.W.2d 726, 730 (Tex. Civ.
App.—Amarillo 1961, writ ref'd n.r.e.), the Amarillo court analyzed a situation where two
of the three leases forming the unit terminated at the end of their primary terms with no
production. The court acknowledged that one of the leases continued—not because it was
held through production, but because it had a longer primary term (six years longer). Id.
at 727. The court specifically refused to agree that, once designated, a pooled unit
remains in existence as long as any single leasehold remains in effect. Id. at 731. The
court also specifically referred to the terms of the leases as governing, acknowledging that,
at minimum, a pooled unit must be made up of two or more leases in full effect. Under that
reasoning, if the lease expired, the pooling agreement could not hold rights to property that
had no lease in effect. (At least, when only one of three pieces of property was still
leased.) The court also concluded the lessors could not be bound by the terms of the
lease pooling clause in their lease after the leases expired. 
          The Corpus Christi Court of Appeals also recognized that a unit is dependent on
existing mineral leases. See MCEN 1996 Partnership v. Glassell, 42 S.W.3d 262, 264
(Tex. App.—Corpus Christi 2001, pet. denied). Further, where leases expressly authorize
the lessees to pool, the interests that are pooled are the leasehold interests of the
lessees.


 Ladd Petroleum Corp., 695 S.W.2d at 107.



          All these cases apply the underlying, basic concept that a unitization agreement is
essentially a conveyance of an interest in realty. Renwar Oil Corp. v. Lancaster, 154 Tex.
311, 276 S.W.2d 774 (1955). Cases have also recognized the obvious fact that both oil
and gas leases and division orders create a contractual relationship, Chicago Corp. v. Wall,
156 Tex. 217, 293 S.W.2d 844 (1956); Shell Oil Co. v. State, 442 S.W.2d 457, 460 (Tex.
Civ. App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.), although, through a lease, the
lessee obtains a realty interest in the property. In comparison to the relationship created
by a lease, a division or transfer order is indeed merely a contractual agreement, and does
not serve to convey part of a royalty interest—it is not a conveyance of an oil and gas
interest. Gavenda v. Strata Energy, Inc., 705 S.W.2d 690, 691 (Tex. 1986); Hogg v.
Magnolia Petroleum Co., 267 S.W. 482 (Tex. Comm'n App.1924, judgm't adopted).
          The question of whether a pooling order serves to transfer a realty interest is an
important point in this discussion—and is one of the easiest to answer. Mineral interests
are interests in real property. Renwar Oil Corp., 276 S.W.2d at 776; State v. Quintana
Petroleum Co., 134 Tex. 179, 133 S.W.2d 112, 114–15 (1939). The original explanation
of pooling described it as resulting in a cross-conveyance of interests in land by agreement
among the participating parties, because of which each obtained an undivided joint
ownership in the royalty earned from the land in the "block" created by the agreement. 
Because of that relationship, the courts determined that royalties were properly distributed
on the basis of the proportion each party's acreage bears to the whole block. Montgomery
v. Rittersbacher, 424 S.W.2d 210, 213 (Tex. 1968); Brown v. Smith, 141 Tex. 425, 174
S.W.2d 43, 46 (1943); MCZ, Inc. v. Triolo, 708 S.W.2d 49, 53 (Tex. App.—Houston [1st
Dist.] 1986, writ ref'd n.r.e.). Thus, under that reasoning, all the parties subject to a pooling
agreement owned an undivided interest in the pooled mineral interests in proportion to their
contribution to the unitized tract. Montgomery, 424 S.W.2d 210; Glassell, 42 S.W.3d at
263.


  
          It naturally follows that a pooling or unitization of mineral leasehold interests is
therefore a transfer of an interest in real estate. Vela v. Pennzoil Producing Co., 723
S.W.2d 199, 206 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.); Kuklies v. Reinert, 256
S.W.2d 435 (Tex. Civ. App.—Waco 1953, writ ref'd n.r.e.). The next question—whether
the transfer of that interest by a lessee exists only as long as does the lease that
transferred the interest to that lessee—is the more difficult one. 
          As stated above, the lessee in the usual oil and gas lease obtains a determinable
fee in the oil and gas in place and, thus, obtains an interest in realty. As a determinable
fee interest, it will last only for the primary term or so long as oil or gas is produced, or, as
in this case, until some other event occurs that results in termination. Norris v. Vaughan,
152 Tex. 491, 260 S.W.2d 676 (1953); Gilbreath v. Douglas, 388 S.W.2d 279, 282 (Tex.
Civ. App.—Amarillo 1965, writ ref'd n.r.e). When the lease that transfers that interest
terminates, the actual lessee's interest itself necessarily terminates simultaneously. The
question remains—does that also extinguish the pooling agreement entered by the lessor?
          The nature of the transfer to the lessee is unarguably one of an interest in realty. 
The lease itself states that any pooling instigated by the lessee would not transfer an
interest in realty from the lessee to the other participants in the pool. Generally, there is
authority holding that, when an oil and gas lease terminates, an overriding royalty created
in an assignment of the lease is likewise extinguished. Sunac Petroleum Corp. v. Parkes,
416 S.W.2d 798, 804 (Tex. 1967).
          There is also authority that, when a determinable fee estate expires, the reverted
interest is conveyed back to the fee owner free and clear of liens, claims, and
encumbrances. See W. T. Waggoner Estate v. Sigler Oil Co., 19 S.W.2d 27, 29 (Tex.
1929) (stating that lessee's assignees as well as lessee itself lost any rights to property on
termination of estate).
          In this case, the lease terminated, and the mineral estate reverted to the fee owner. 
See Natural Gas Pipeline of Am. v. Pool, 124 S.W.3d 188, 192 (Tex. 2003). Even though
the lessee had the right to pool the property, it could pool no more than it owned, and it
only had an ownership interest in the mineral estate until that right was terminated. The
pooling agreement itself expressly transferred only lessee's interest—a determinable
fee—that ceased when the lease terminated. Thus, it is reasonable to conclude that the
trial court acted correctly in concluding that the pooling provision was no longer in effect
as to Sheppard. 
          We realize that a fair part of Wagner's argument focuses on the nature of the
relationship of lessor and lessee as a type of agency relationship—and, Wagner argues,
a relationship that permits binding contracts to be entered that would survive termination
of the lease. Under the authorities discussed above, we disagree. It is uncontested that
Wagner had the authority to agree on the unit designation and to commit Sheppard's
interest to that unit. That authority, however, existed only because the lease existed, which
transferred a "bundle of sticks" to Wagner for safekeeping. Wagner could not have
transferred more than it had available—and the cases cited above clearly show that the
termination automatically returned the "bundle" to the mineral owner free and clear of
encumbrances. Any transfer or assignment by the lessee could only be of as much of the
property as it owned pursuant to the lease. The property rights possessed by Wagner
vanished, and when they did, so necessarily did the rights to that property that were
dependent on Wagner's lease. The first point of error is overruled. 
Can Wagner Recoup Expenses Incurred Before Termination?
          Wagner next contends the court erred by finding that it was not entitled to recoup
one-eighth of the costs and expenses for drilling, testing, completing, and equipping the
Landers No. 1 Well. The court found that Wagner could recoup one-eighth of expenses
and costs incurred after termination, but that it could not obtain repayment for expenses
and costs incurred before termination of the lease. 
          Wagner correctly points out that termination converted Sheppard from a lessor to
an unleased co-tenant and that Sheppard must, therefore, bear her share of costs and
expenses. Cox v. Davison, 397 S.W.2d 200, 202–03 (Tex. 1965). Sheppard agrees this
is correct, but argues that the costs incurred before she became an unleased co-tenant
were properly excluded, because at the time they were incurred (during the term of the
lease), she had no liability for them.
          The simple fact is that these parties were in one relationship and that relationship
ended. When it did, their respective responsibilities and duties necessarily changed to
reflect the differences in the relationship. When Sheppard was the lessor of the property,
she had no liability for what the lessee chose to do. Wagner has directed us to no rule of
law that would in some way make her retroactively liable for such expenses and costs, and
has advanced no convincing argument to justify such an action. Its contention to the
contrary is overruled. 
Can Wagner Deduct Leasehold, Land/legal, and Overhead Expenses?
          Wagner also contends it should be entitled to deduct "leasehold, land/legal, and
overhead expenses" attributable to both wells from Sheppard's one-eighth share of the
production revenue. The trial court entered a finding of fact that Wagner had deducted
expenses entitled "Leasehold," "Land/Legal," and "Overhead" from Sheppard’s one-eighth
share of the production revenues attributable to Landers No. 1 Well and Landers No. 2
Well. There is no other relevant finding of fact. The court, thereafter, made a conclusion
of law stating that
[Wagner] may not deduct [their] expenses entitled "Leasehold,"
"Land/Legal," and "Overhead" from Plaintiff's 1/8 share of the production
revenues attributable to the W.M. Landers Nos. 1 and 2 Wells; 

          Wagner has directed us to no request for additional or amended findings of fact that
would be relevant to this discussion, but contends that, as a matter of law, it is entitled to
this type of a recovery (or offset). Wagner further contends it provided evidence proving
as a matter of law the amount to which it is entitled.
          As Sheppard implicitly acknowledges, certain types of expenses may be recoverable
from co-tenants. See Byrom v. Pendley, 717 S.W.2d 602, 605 (Tex. 1986). As the Texas
Supreme Court has held, the extracting tenant must account for the value of minerals
taken, less the necessary and reasonable costs of production and marketing. Id.; Superior
Oil Co. v. Roberts, 398 S.W.2d 276 (Tex. 1966); Tynes v. Mauro, 860 S.W.2d 168, 176 
(Tex. App.—El Paso 1993, writ denied).
          That language is relatively imprecise and has been seldom addressed. It has been
described as requiring a co-tenant to reimburse his co-owners for moneys necessarily
spent for the benefit of the common estate. Neeley v. Intercity Mgmt. Corp., 732 S.W.2d
644, 646 (Tex. App.—Corpus Christi 1987, no writ). Expenditures involved in keeping the
estate in production are reimbursable, though unsuccessful reworking operations are
not—and reimbursement is to be pro-rata, out of the share in actual production. Shaw &
Estes v. Tex. Consol. Oils, 299 S.W.2d 307, 313 (Tex. Civ. App.—Galveston 1957, writ
ref'd n.r.e); see Cox v. Davison, 397 S.W.2d 200, 201 (Tex. 1965). Similarly, if a co-tenant
drills a dry hole, that co-tenant does so at its own risk and with no right to reimbursement. 
Willson v. Superior Oil Co., 274 S.W.2d 947 (Tex. Civ. App.—Texarkana 1954, writ ref'd
n.r.e.).
          When reviewing the trial court's findings of fact and conclusions of law, the fact
findings are of the same force and dignity as a jury's verdict on special issues. F.D.I.C. v.
F & A Equip. Leasing, 854 S.W.2d 681, 684 (Tex. App.—Dallas 1993, no writ); MJR Corp.
v. B & B Vending Co., 760 S.W.2d 4, 10 (Tex. App.—Dallas 1988, writ denied). Because
there are no additional or amended findings of fact on this particular issue, we have
nothing to directly review for evidentiary sufficiency. 
          Although an appellant may not challenge a trial court's conclusions of law for factual
insufficiency, the reviewing court may review the trial court's legal conclusions drawn from
the facts to determine their correctness. BMC Software Belgium, N.V. v. Marchand, 83
S.W.3d 789, 794 (Tex. 2002); Templeton v. Dreiss, 961 S.W.2d 645, 656 n.8 (Tex.
App.—San Antonio 1998, pet. denied). Conclusions of law are reviewed de novo as a
question of law and will be upheld if the judgment can be sustained on any legal theory
supported by the evidence. McAllen Police Officers Union v. Tamez, 81 S.W.3d 401,
404–05 (Tex. App.—Corpus Christi 2005, pet. dism'd); Circle C Child Dev. Ctr., Inc. v.
Travis Cent. Appraisal Dist., 981 S.W.2d 483, 485 (Tex. App.—Austin 1998, no pet.). A
trial court's conclusions of law may not be reviewed for factual sufficiency, Tamez, 81
S.W.3d at 404, and may be reversed only if they are erroneous as a matter of law. Id. at
404–05 (citing Stable Energy, L.P. v. Newberry, 999 S.W.2d 538, 547 (Tex. App.—Austin
1999, pet. denied)).



          In order to conclude that the court's ruling was erroneous as a matter of law, we
would be required to determine that the evidence conclusively showed that the expenses
were of the type for which reimbursement is proper (i.e., for production and marketing), that
they were reasonable and necessary, and finally that they benefitted the co-tenancy.
          The evidence presented by Wagner showed it had lumped together a series of
expenses incurred on other tracts included in the Landers Unit with those that were
incurred on Sheppard's tract. The fees included landman fees, lease bonuses, recording
fees, and title opinion expenses incurred for the other tracts in the unit, most of which
involved the initial creation, and later maintenance of the unit. Wagner declined to
segregate these expenses. There is no evidence to show these expenses were involved
in production or marketing from the drill-site tract. At most, they may have been involved
in the preparation for entering the drilling process on the other tracts. 
          Further, although Wagner takes the position that the costs were necessarily
reasonable and "customary," they have not directed us to any evidence on that matter. 
There is some testimony by a Wagner employee that he believed the expenses were
reasonable and customary, but again, there is nothing to divide one set of expenses from
another or to show how those expenses benefitted the co-tenancy. 
          Even in its own argument, Wagner takes the position that all these expenses were
expended to develop the Landers Unit and not the particular well site that is Sheppard's
own tract. Under this state of the evidence, Wagner has not shown the court's conclusion
of law is without support in the record.
          The other portion of this argument concerns "overhead" expenses incurred under
Wagner's joint operating agreement. Sheppard has no strong argument for avoiding her
share of these charges. Even though memorialized in a Joint Operating Agreement, the
overhead for operation of the Landers Unit is something that is typically connected with the
production of the well. However, the evidence to which Wagner directs us says no more
than that the overhead charges that have been made are no higher than are charged to
other people in the field and are not excessive. That does not constitute evidence that the
charges labeled as "overhead" are actually the type of charges that would be recoverable.
          The "overhead" charges are a closer question than the legal/leasehold charges, but
the evidence to which we have been directed is not of such a nature as to show that the
trial court wrongly decided the issue. The contention of error is overruled.
 
 
Must Wagner Account to Sheppard on a Well-By-Well Basis?
          Wagner next contends the court erred by finding that Sheppard was not required
to bear responsibility on an aggregate basis for her share of the costs expended to drill and
operate the two wells. Once again, counsel has not directed us to any particular finding
of fact or conclusion of law that is under attack. It appears Wagner is complaining of
finding of fact number 10, stating that, as co-tenants, Wagner was required to account to
Sheppard for her share of the Landers No. 1 Well and the Landers No. 2 Well on a well-by-well basis instead of on an aggregate basis and that Wagner could not offset revenues
from the No. 1 Well to pay for expenses incurred on the No. 2 Well. 
          It appears Wagner's complaint is based on an expensive workover—through re-entry—of the Landers No.1 Well. There is some dispute as to whether Wagner is entitled
to recover Sheppard's proportionate share of the costs from the Landers No. 1 Well
production revenues since the 2002 re-entry was not what one would call a cash-flow
success.


 The question here is whether Wagner can siphon off funds from the Landers
No. 2 Well production revenues to repay those costs. The reworking operations did not,
from the undisputed evidence, return the Landers No. 1 Well to profitability, and there is
no evidence that it in any way benefitted the Landers No. 2 Well. 
          Wagner has not been able to supply any authority suggesting that all operations
should be lumped together for purposes of revenue production, to be used together to
reimburse for work performed on multiple wells. The general rules on reimbursement, as
set out in the preceding discussion, are fairly straightforward, but it is clear that each case
applied those rules to the co-tenant's work on individual wells, not to the tract in general. 
As Wagner acknowledges, they could not recover anything had they drilled a dry hole. 
Willson, 274 S.W.2d 947. Wagner argues, however, that this was not a dry hole, thus that
concept does not apply, a position which we do not find convincing. 
          Wagner is also confronted with the general precept that the expenditure for which
they seek to recover must have been of benefit to the co-tenancy. It is difficult to see how
a failed re-entry was of general benefit to the co-tenancy so that it would justify burdening
all of the wells within the scope of that co-tenancy. It is clear the costs were necessarily
connected with the production of that particular well. It would be appropriate, therefore,
for the pro rata costs to be taken from the production of that well. 
          Wagner directs our attention to two analogous cases. The first case dealt with the
situation where the lease expired after a well was drilled, but before the well was reworked
by the lessee who was "a good faith trespasser," and the Corpus Christi court held that the
former lessee was not entitled to reimbursement for drilling expenses, but was so entitled
for reworking expenses on that well. Hunt v. HNG Oil Co., 791 S.W.2d 191 (Tex.
App.—Corpus Christi 1990, writ denied). In that opinion, the Corpus court briefly discussed 
Broadway v. Stone, 15 S.W.2d 230 (Tex. Comm'n App. 1929), in a fashion that would
appear to support Wagner's position in this appeal (that it is entitled to recover for
improvements by combining the income of all wells and offsetting against all expenses). 
          In Broadway, Stone had drilled four producing wells under a lease he thought
covered everyone. It did not. Without knowing they had any interest, Broadway
transferred their rights, including a one-thirty-sixth interest in the minerals, to Miller. At the
time Miller obtained the interest, there was another well being drilled that also became a
producer. Miller sued Stone. The Commission held that Miller took the undivided interest
charged with the equitable right of Stone to "ratable compensation for said improvements." 
In concluding paragraphs of the opinion, however, the Commission held that the trial court
"erroneously failed to charge Miller's interest in the oil and gas produced subsequent to
June 28, 1922 (the date Miller obtained the rights from Broadway), with a proportionate
part of the expenses incurred by Stone subsequent to that date in completing the
unfinished well and in operating the wells for oil and gas." Id. at 232. 
          Neither of these cases suggest that all income from all wells on a tract should be
rolled together and then used to offset all expenses of operation or of drilling. The
Broadway opinion does not indicate that the Commission was willing to take income
produced by one well to pay expenses incurred on another well. Further, the portion of the
opinion quoted above directs the application of the law set out previously, allowing only
recovery for proportionate expenses after the date Miller obtained rights to the property and
not for the costs of prior improvements. Neither Hunt nor Broadway stand for any
proposition that is in conflict with the trial court's ruling in this case. The contention of error
is overruled. 
Conclusion
          After Sheppard's lease terminated, her interests were no longer subject to the
pooled unit. Wagner cannot recoup expenses incurred before Sheppard's lease
terminated and cannot deduct leasehold, land/legal, and overhead expenses. Wagner
must account to Sheppard on a well-by-well basis. 
          For these reasons, we affirm the judgment.



                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      June 14, 2006
Date Decided:         July 14, 2006