L. M. BENNETT V. JOE W. COPELAND.

No. A-2772. Decided January 10, 1951.
(235 S. W., 2d Series, 605.)

*Fred O. Senter, Jr.,* of Marfa, *Runge & Hardeman* and *Carl Runge,* all of San Angelo, for Petitioners.

The Court of Civil Appeals erred in holding that the agreement provides for a forfeiture of respondent's investment and is not susceptible of specific performance; that the judgment of the trial court decreed a forfeiture of title; and that the performance of the contract will be a hardship. Stephenson v. Calliham, 289 S. W. 158; State v. Compton, 142 Texas 494, 179 S. W. 501; Huffhines v. Bourland, Com. App., 280 S. W. 561; Simpson v. Green, Com. App. 231 S. W. 375.

*H. O. Metcalf*, of Marfa, *Bill L. Holland, Whitaker, Turpin, Kerr, Smith & Brooks*, and *Richard S. Brooks*, all of Midland, for respondent.

In response to the propositions of petitioner cited:—Corzelius v. Oliver, 148 Texas 76, 220 S. W. 2d 632; McKenzie Const. Co. v. City of San Antonio, 131 Texas 474, 115 S. W. 2d 617.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is a suit by L. M. Bennett, petitioner, against Joe W. Copeland, respondent, for specific performance of a contract to convey certain lands and grazing leases. A trial court judgment for Bennett was reversed by the Court of Civil Appeals and the cause remanded, Associate Justice Sutton dissenting. 232 S. W. 2d., 765.

On September 7, 1946, L. F. Burris and wife conveyed to Bennett and Copeland 11 sections of land and grazing leases from the University of Texas, the County of Presidio and the State of Texas on certain other lands, all located in Presidio, Jeff Davis and Hudspeth Counties, Texas. The consideration was $20,000 cash and the execution by grantees of 5 vendor's lien notes aggregating $35,000 payable in 1 to 5 years; grantees also took title subject to all unpaid indebtedness due the State of Texas on 6 sections of the land and subject to the terms and conditions of the several grazing leases.

On December 6, 1946, Copeland and Bennett signed a contract which recited: (1) the obligations undertaken by them in the Burris deed, "all of which said indebtedness (the 5 vendor's lien notes) principal, interest, State indebtedness and State interest and grazing lease rentals will have to be paid promptly on their respective maturity dates, as provided for, and each of the parties hereto do hereby agree, promise and covenant to and with each other that they each will promptly pay his one half of all said indebtedness on the respective

maturity dates thereof, * * * without fail or default in any manner whatever"; (2) that costly improvements were necessary to place their ranch properties in condition to be leased for grazing purposes at the best possible rental, for which reason each agreed to pay his half of all such improvement indebtedness as and when the improvements were made; and (3) that each party recognized that failure of either to pay his half of any indebtedness against the properties would greatly inconvenience the other and automatically require him to pay not only his half but the defaulter's half as well, therefore the contract was made "for the purpose of preventing the happening of the very things and hazards hereinabove mentioned and contemplated." Then followed the provision, the construction and application of which is the purpose of this suit:

"(4) Now, therefore, for and in consideration of the premises aforesaid and of the mutual agreements, promises and covenants herein made by each party to the other party, and of the mutual benefits and advantages which will accrue to each of said parties by reason of the making and carrying out of this contract, I, the said JOE W. COPELAND, do hereby contract and agree with the said L. M. BENNETT, that in the event I fail to promptly pay, at and upon the respective maturities thereof, at the time or times, in the amount or amounts, and in the manner, as provided in said deed, notes, State purchase price and interest obligations and in said grazing leases, hereinbefore referred to, my one-half of the principal and interest installments, provided for in said five vendor's lien notes, and my one-half of the State principal and interest indebtedness, owing, accruing and to accrue on said unpatented lands, and my one-half of the grazing lease rentals maturing under the grazing leases described in and transferred in and by said above mentioned deed, and my one-half of all taxes against said properties, as they become due and before becoming delinquent or in default, and my one-half of the cost of all improvements, labor and materials used therein, heretofore or hereafter made upon said properties, or any part thereof, or my one-half of any indebtedness which may be hereafter incurred in the purchase or lease of any additional ranch lands or ranch properties, either as purchase price therefor or interest thereon, or grazing lease rentals thereon, or taxes or improvements thereon, at the time or times, in the amount or amounts and in the manner provided therefor in the contract of purchase or lease or in the contract or contracts for improvements thereon, *then and in that event, I hereby agree and contract with said L. M. Bennett to then, at the date of such default, sell and convey to the said L. M. Bennett, his heirs, executors,*

*administrators or legal representatives, all of my undivided interest in and to said lands, premises, properties and improvements, both fee title and leasehold title, described in and conveyed by said deed above mentioned from said L. F. Burris and wife to said Joe W. Copeland and L .M. Bennett, at and for the amount which I then actually have invested in cash in said ranch lands and properties and improvements, as well as all of my undivided interest in and to any other lands and improvements and ranch properties, which the said Joe W. Copeland and L. M. Bennett may hereafter jointly purchase, also at and for the amount which I then actually have invested in cash in said additional lands, improvements and ranch properties, both fee simple title lands and leasehold lands,* and from such purchase price for said lands, both original and additional lands, the said L. M. Bennett is authorized to deduct whatever total amount I, the said Joe W. Copeland, may then owe to said L. M. Bennett for moneys theretofore advanced by said L. M. Bennett to me, or for my account, for the purpose of paying my one-half or any part of my one-half of any principal or interest installments on said notes or any of them, or on my one-half of any State principal or interest indebtedness, or on my one-half of the grazing lease rentals, or on my one-half of taxes, or on my one-half of cost of any labor, materials and improvements, or on my one-half of cost of any additional lands which may have been purchased or leased by us, the balance of such purchase price to be so paid to me or my heirs, executors, administrators, or legal representatives, by said L. M. Bennett, in cash, at Marfa, Texas, within SIXTY days after the date of my said default hereinbefore referred to, my contract of sale herein provided for to begin and take effect and date from the date of such default above provided for; and the provisions and contract herein now provided for, in event of such default, shall apply to and bind and be in effect, both as to myself, individually, if alive at that time, and my estate and my heirs, executors and administrators, if I am not alive at that time; and the said L. M. Bennett, for the considerations aforesaid, hereby accepts said contract of sale here so made, and hereby agrees to purchase said undivided one-half interest of said Joe W. Copeland, under the contingencies and at and for the purchase price and terms hereinabove provided for. This contract of sale as here made, and under the contingencies here stated, is irrevocable, and shall run as a covenant with the title to said lands, as long as any portion of the purchase price, indebtedness, principal or interest, or State principal or interest indebtedness, or grazing lease rentals, or taxes, or cost of improvements shall remain unpaid."

Paragraph (5) is in identical language except that the names of Bennett and Copeland are transposed.

The parties further agreed that one Forrest Hope should keep all books relating to the ownership of the ranch properties, bank all receipts and pay all bills including any indebtedness accruing against the ranch; and that either party's cash investment in the venture at any time "shall be determined by the figures shown and reflected by said books so kept by said Hope."

Bennett alleged that Hope had kept an account of the business dealings between Bennett and Copeland under their contract; that this account reflects that Bennett has fully performed his obligations but that Copeland has defaulted; that he had contributed $17,885.44 on indebtedness maturing against their ranch properties, while Copeland had paid only $710.63; that, therefore, Copeland had defaulted to the extent of $8,-587.40, which was paid by Bennett. Bennett further alleged that Copeland is bound under their contract to convey to him Copeland's undivided interest in the fee and leasehold title to the lands covered thereby; that he, Bennett, is ready and willing and tenders and offers to pay into the court registry "the net amount of the consideration" for Copeland's conveyance to him of the former's interest in the properties. In the alternative, Bennett alleged that he had invested in the ranch properties $26,718.25 more than Copeland had paid and prayed that in the event it was determined that he was not entitled to specific performance he was entitled to judgment for $13,359.02, half the excess so paid by him.

The trial court directed the jury to answer "yes" to the one special issue submitted inquiring whether Copeland "was in default, on December 23, 1948, in the performance of that contract entered into between defendant and plaintiff dated December 6, 1946." Copeland excepted to this action.

■ The judgment decreed specific performance as prayed by Bennett and ordered Copeland to convey to him the lands and leasehold interests conveyed by Burris et ux. to Bennett and Copeland. He ordered Bennett to pay into the court registry by March 27, 1950, $15,859.53, which was to be paid to Copeland when he had executed to Bennett a proper deed. The court further decreed that failure of Copeland to deliver such deed "shall operate ipso facto as a sale and conveyance" of his interest in the ranch properties to Bennett.

As a preliminary question in the Court of Civil Appeals Copeland urged that the trial court judgment was not final in that it does not make it obligatory upon Bennett to pay the $15,859.53 into the court registry by March 17, 1950. Then he contended that the trial court judgment ignores his cross action for accounting and partition of the ranch properties, without even providing what shall happen to it in the event Bennett does not make the payment directed.

■ The Court of Civil Appeals concluded that while the judgment did not provide what Copeland's rights were if Bennett did fail to deposit the money within the alloted time, the law is that his right to specific performance would thereby be lost; and that Copeland would be entitled to have the issues raised in his cross action heard either in this or in another suit, wherein Bennett could not assert any right to specific performance because of the principle of res adjudicata. We think that holding is correct. Under the trial court's judgment Bennett was entitled to specific performance, therefore Copeland's accounting had to be made under the terms of the contract, by which method it was found that he was entitled to receive from Bennett the sum of $15,859.53. Under that conclusion it necessarily followed that Copeland was not entitled to any relief on his prayer for a partition and accounting. Therefore, although the judgment did not so recite, it did adjudicate the cross action by necessary implication. That principle was announced by this court in Trammell et ux. v. Rosen, 106 Texas, 132, 157 S. W. 1161, which has been cited with approval by numerous subsequent cases.

Copeland presented eleven other points but the Court of Civil Appeals held that its conclusion on his second point was decisive of the appeal, hence it did not decide the others.

■ The second point was: "The contract declared upon is without equity in that it provides for a remedy by specific performance so harsh and inequitable * * in regard to the price to be paid * * for such performance, as to make it an unconscionable forfeiture not enforcible in equity."

The Court of Civil Appeals concluded that the very terms of the contract provide for a forfeiture of Copeland's capital investment "to the extent at least" that Bennett's investment exceeds Copeland's, hence that a decree of specific performance would necessarily decree and enforce a forfeiture; that, since performance of the contract will render Copeland liable to a

forfeiture, its performance is a hardship and will not be ordered by a court of equity.

The result complained of by Copeland in his second point is no more than he and Bennett mutually and very clearly provided for. Their contract was undoubtedly fair when made because it imposed identical obligations on each of them; and, although its enforcement may be hard on Copeland, that was a contingency which he might forseee when he made it and for which Bennett is in no way responsible. There is no claim that the contract resulted from any fraud or overreaching.

■ The point is settled by the principle thus stated in the Annotation to Schmidt v. Barr 333 Ill. 494, 165 N. E. 131, 65 A. L. R. 1, at page 75:

"Mere hardship is not sufficient ground for denial of the right to specific performance of a contract otherwise subject to enforcement. * * Especially where it was fairly and voluntarily assumed as part of a contract. * * In this respect a contract for the sale of land will be enforced as a matter of right, regardless of its wisdom or folly, if fairly and understandingly made. * * Ross v. Carroll (1923) 156 Minn. 132, 194 N. W. 315, is authority for the view that courts cannot arbitrarily refuse specific performance of a contract, because they deem it unwise, or because subsequent events disclose that it will result in a loss to defendant; but to justify the refusal of this relief it must appear that the defendant had been misled and overreached to such an extent that the contract is unconscionable."

The rule is discussed and applied in an approved opinion of the Commission of Appeals in Simpson v. Green, 231 S. W., 375 .See also, Allen et al. v. Haynes, 309 Ill., 374, 141 N. E., 188, and 58 C. J., p. 894.

In discussing specific performance as a purely equitable remedy, Pomeroy says: "Whenever a contract concerning real property is in its nature and incidents entirely unobjectionable,—when it possesses none of those features which, in ordinary language, influence the discretion of the court,—it is as much a matter of course for a court of equity to decree its specific performance as it is for a court of law to give damages for its breach." Pomeroy's Eq. Juris. (5th Ed.), vol. 4, p. 1034, sec. 1402.

■ Therefore, we hold that the trial court did not abuse his

discretion in ordering specific performance. This holding requires a reversal of the judgment of the Court of Civil Appeals but it leaves ten points of error raised there by Copeland undecided. Hence it is proper under Rule 503, T. R. C. P., to remand this cause to that court to pass on them. See Block v. Aetna Casualty & Surety Co., 138 Texas, 420, 159 S. W. 2d., 470.

Judgment of the Court of Civil Appeals reversed and cause remanded to that court for further consideration.

Associate Justice Wilson not participating.

Opinion delivered January 10, 1951.

No motion for rehearing filed.