WAGNER & BROWN, LTD.
et al, Petitioners,

v.

Jane Turner SHEPPARD, Individually
and as Independent Executrix of the
Estate of Sybil Turner, Deceased, Re-
spondent.

No. 06–0845.

Supreme Court of Texas.

Argued Dec. 5, 2007.

Decided Nov. 21, 2008.

Rehearing Denied June 5, 2009.

J. Gregory Copeland, Macey Reasoner Stokes, Baker & Botts, Houston, TX, Jerry S. Harris, Harbour Smith Harris & Merritt, Longview, TX, Julie Ann Walker, Miller Mentzer, P.C., Palmer, TX, for Petitioners.

Ronald O. Holman, Alan Edward Wright, Ben L. Mesches, Haynes & Boone, L.L.P., Dallas, TX, for Respondent.

Michael E. McElroy, McElroy Sullivan & Miller, L.L.P., Pamela Stanton Baron, Austin, TX, for Amicus Curiae.

Justice BRISTER delivered the opinion of the Court.

One observer has estimated that 85 percent of the 27,000 wells drilled in the East Texas oil field in the first half of the 20th century were unnecessary—resulting in a huge waste of money and natural resources.[1] As one means of reducing ex-

---

1. Howard R. Williams, *Conservation of Oil and Gas*, 65 HARV. L.REV. 1155, 1166 (1952) ("It has been estimated that all but 3,000 or 4,000 of the 27,000 wells in the East Texas field are unnecessary. The waste of materials and labor in this field alone may well exceed one billion dollars, and the unnecessary drill-

cessive drilling, the Texas Legislature provided for voluntary pooling in 1949,[2] and compulsory pooling in 1965.[3]

Since then, this Court has never addressed how a pool of producing properties is affected if a lease in the pool expires. In this case, the courts below held that expiration of a lease removes those minerals from the pool and bars recovery of any costs incurred before termination. But the pooling agreement here did not depend on the continuation of underlying leases, nor was the equitable right of reimbursement for improvements necessarily extinguished by termination of the lease. Accordingly, we reverse and remand for further proceedings.

## I. Background

Jane Sheppard, a CPA and retired family lawyer, owns 1/8th of the minerals underlying a 62.72–acre tract in Upshur County, Texas.[4] C.W. Resources, Inc. leased her 1/8th interest, and along with Wagner & Brown, Ltd. leased the other 7/8ths of the minerals from other owners. Sheppard's lease had a special addendum providing that if royalties were not paid within 120 days after first gas sales, her lease would terminate the following month.[5]

Sheppard's lease also authorized pooling with adjacent tracts. On September 1, 1996, C.W. Resources, Wagner & Brown, and mineral lessees on adjacent tracts signed a unit agreement pooling the Sheppard tract and eight others to form the W.M. Landers Gas Unit.[6] One month later, a gas well was successfully completed and began producing, and a second well was completed in September 1997. Both wells were physically located on the Sheppard tract, but pursuant to the unit agreement proceeds and costs were split among all the tracts in proportion to acreage.

The original unit agreement designated C.W. Resources as operator of the unit. In September 2000, Wagner & Brown took over that position, and discovered that Sheppard had not been paid royalties within 120 days of the first gas sales. Wagner & Brown offered Sheppard a new lease, but with two producing wells already on her property, she declined. The parties agree that Sheppard's lease terminated on March 1, 1997, and since then she has been an unleased co-tenant, entitled to her share of proceeds from minerals sold less

ing costs in Texas may well exceed fifty million dollars per year.").

**2.** Act approved May 24, 1949, 51st Leg., R.S., ch. 259, § 1, 1949 Tex. Gen. Laws 477–83 (current version at TEX NAT RES.CODE § 101.011).

**3.** Act approved March 4, 1965, 59th Leg., R.S., ch. 11, § 2, 1965 Tex. Gen. Laws 24–6 (current version at TEX. NAT. RES.CODE § 102.011); see R.R. Comm'n v. Miller, 434 S.W.2d 670, 671 (Tex.1968).

**4.** Sheppard appears individually and as independent executrix of the estate of Sybil Turner, deceased.

**5.** The provision stated:

Within 120 days following the first sale of oil or gas produced from the lease premises, or lands pooled therewith, settlement shall be made by Lessee, or by Lessee's agent, for royalties due hereunder with respect to such oil or gas, and such royalties shall be paid monthly thereafter without the necessity of Lessor executing a division or transfer order. If said initial royalty payment is not so made under the terms hereof, this lease shall terminate as of 7:00 A.M. the first day of the month following the expiration of said 120 day period.

**6.** The other parties joining in the unit agreement were defendants Thompson Interests, Inc., Carl A. Westerman, Westerman Royalty Company, Bernie Wolford, and H.G. Westerman.

her share of the costs of production and marketing.

The dispute here concerns both the proceeds and the costs. Regarding the proceeds, the question is whether the termination of Sheppard's lease also terminated her participation in the unit (in which case she is entitled to 1/8th of 100 percent of production, as both wells are on her tract), or did not do so (in which case she is entitled to 1/8th of only 51.3 percent of production—the proportion her tract bears to total acreage in the unit).[7] Regarding the costs, the question is whether Sheppard should bear any costs incurred *before* her lease terminated, or any costs incurred *after* the lease terminated that relate to the unit but not her lease.

The trial court granted summary judgment for Sheppard, finding that termination of the lease also terminated her participation in the unit, that she was not liable for any costs incurred before termination, and that she was liable for costs incurred after termination only if they pertained solely to her lease; the court of appeals affirmed.[8] For the reasons stated below, we disagree.

## II. Does Termination of the Lease Also Terminate the Unit?

Sheppard's 1994 lease contained a standard industry pooling clause that provided:

Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests.... Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling

or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit.... In the absence of production in paying quantities from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance of interests.

The Designation of Unit signed by the lessees of the various "leases and lands" included in the pool provided that they "hereby pool and combine said leases and the lands ... into a single pooled unit or unitized area for the development of and production of gas and associated hydrocarbons...."

We disagree with Wagner & Brown that the portion of Sheppard's pooling clause regarding termination for lack of production resolves this case. That clause provides that the unit *"may terminate"* if production ceases, but there is nothing to show this was intended to be the exclusive means. The documents do not specify what happens to the unit when one lease terminates, so this case calls for interpretation rather than plain reading.

But we agree that a proper interpretation of these documents indicates the termination of Sheppard's lease did not terminate her participation in the unit. A lease is not necessarily required for pooling; mineral owners can join a pool even if no lease exists.[9] Here, both Sheppard's

---

7. Sheppard's 62.72 acre tract compared to a total of 122.15954 acres in the unit.

8. 198 S.W.3d 369.

9. *See Westbrook v. Atl. Richfield Co.*, 502 S.W.2d 551, 554 (Tex.1973) (concluding that mineral owners who were free of any lease ratified unit agreement).

lease and the unit agreement pooled certain "premises" and "lands," not just their leased interests. Although Sheppard's lease expired, the lands themselves obviously did not. Thus, while termination of Sheppard's lease changed who owned the mineral interests in the unit, it did not cause the unit to terminate because it was a pooling of lands, not just leases.

On precisely this basis, the Second Court of Appeals held in *Ladd Petroleum Corp. v. Eagle Oil & Gas Co.* that termination of a lease does not terminate a unit.[10] The lease in *Ladd* allowed pooling with "other lands" as well as other leases, so the unit survived the termination of one lease because "the continuing validity of any such pooling was not dependent upon a subsisting leasehold estate in the adjacent land."[11] In this case as in *Ladd*, lands as well as leases were pooled, so the tracts dedicated to the unit survived even if the related leases did not.

The court of appeals here distinguished *Ladd* on the ground that it involved termination of an entire pool, while Sheppard seeks only termination of her participation in it.[12] But there cannot be one rule of contract interpretation for small mineral interests and a different rule for large ones. If Sheppard's original mineral interest had been 8/8ths rather than 1/8th, the ruling she seeks would have cut off all production for the other members in the

pool just as occurred in *Ladd*. And if her original interest had been 5/8ths or more, her share would have curtailed their share, even though they had nothing to do with letting her lease terminate.[13]

The court of appeals relied on *Texaco, Inc. v. Lettermann*, in which the Seventh Court of Appeals held that the termination of two out of the three leases in a unit resulted in termination of the pool.[14] But the lease in *Lettermann* only authorized pooling *"with the gas leasehold estate"* of adjacent lands.[15] Thus, when those leasehold estates terminated, so did the pool. But that does not mean a unit formed by pooling *lands* must terminate on the same basis as one formed by pooling only *leases*.

The court of appeals also reasoned from the premise that the pooling agreement transferred only the operator's interest, leaving Sheppard's possibility of reverter unimpinged. But her lease allowed pooling of "all or any part of the leased premises or interest therein," and Sheppard's reverter was certainly an interest in the leased premises. "When a unit is properly pooled, the owners of the minerals *or reversionary interests* in a separate tract within the unit surrender their right to receive their interest in all production from wells located on their own tract...."[16] Just as pooling impinges on a mineral owner's royalty interest,[17] it also

---

**10.** 695 S.W.2d 99, 106 (Tex.App.–Fort Worth 1985, writ ref'd n.r.e.).

**11.** *Id.*

**12.** 198 S.W.3d at 375.

**13.** A co-tenant owning 5/8ths of the minerals would be entitled to 62.5 percent of production, whereas the other pool members here were entitled to 49.7 percent of production based on their proportional acreage in the pool.

**14.** 343 S.W.2d 726, 730 (Tex.Civ.App.–Amarillo 1961, writ ref'd n.r.e.).

**15.** *Id.* at 727 (emphasis added).

**16.** *Mengden v. Peninsula Prod. Co.*, 544 S.W.2d 643, 648 (Tex.1976) (emphasis added); *Southland Royalty Co. v. Humble Oil & Ref. Co.*, 151 Tex. 324, 249 S.W.2d 914, 916 (1952).

**17.** *See Southland Royalty*, 249 S.W.2d at 916; *Brown v. Smith*, 141 Tex. 425, 174 S.W.2d 43, 46 (1943).

may impinge on an owner's possibility of reverter.

The parties invite us to decide the question here based on general principles rather than the terms of the particular documents involved. Wagner & Brown urges that termination of a lease should never terminate a pool, pointing out that pooling benefits mineral owners, operators, the state, and the environment by reducing the number of wells needed to maintain efficient production while protecting correlative rights.[18] Sheppard urges adoption of a treatise's view that "pooling can extend no longer than the lease itself" because a lessor grants only "a power to pool the leasehold rights." [19]

█ But oil and gas leases in general, and pooling clauses in particular, are a matter of contract.[20] Just as owners and operators generally must agree to create a pool,[21] they should also be able to agree when one terminates. If the parties want pooling to expire (or not) upon termination of one lease, they should be free to say so.[22]

The lease here allowed the Sheppard tract (rather than just the lease) to be pooled for purposes of production, and that is what the unit designation did. As termination of the lease changed none of the lands committed to the unit, we hold that it did not terminate the unit. Thus, while Sheppard is entitled as a co-tenant to 1/8th of the proceeds due to the mineral owners of her tract, that does not entitle her to 1/8th of the proceeds that must be shared with mineral owners of other tracts by the terms of the unit agreement.

## III. Must Sheppard Pay a Share of Unit Expenses?

Based on the conclusion that the Landers unit had terminated, the courts below denied Wagner & Brown's claim for leasehold, land/legal, and overhead expenses to the extent they related to the unit rather than solely to Sheppard's tract.[23] Because we have held the unit did not terminate, Wagner & Brown properly accounted to Sheppard for both production and ex-

---

**18.** *See Mengden,* 544 S.W.2d at 647; Howard R. Williams, *Conservation of Oil and Gas,* 65 HARV. L.REV 1155, 1164 (1952) (recommending compulsory pooling as a conservation measure because "dense spacing dissipates reservoir energy, occasions some wastage of oil or gas while the wells are being cleaned out, increases the hazards of fire or other accidents which cause loss of minerals or damage to the producing structure, and results in uneconomic use of materials and labor in the drilling of unnecessary wells").

**19.** 1 BRUCE M. KRAMER & PATRICK H. MARTIN, THE LAW OF POOLING & UNITIZATION § 15.04 (3d. ed.2006). The authors acknowledge that the question here is "difficult," that "another way of viewing the pooling clause" is that it continues under the normal rules of principal and agent, and that "[i]t is necessary to look at all the circumstances of the pooling in order to determine whether there is a continuation of the pooling once a lease that has been pooled may be said to have terminated."

*Id.* The authors also serve as editors of another treatise stating that "[e]xpiration or other extinguishment of a unitized interest will cause termination of the unit as to such interest." 6 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL & GAS LAW § 931.2 (Patrick H. Martin & Bruce M. Kramer eds., 2007). Both entries rely almost entirely on *Texaco, Inc. v. Lettermann,* in which (as we have noted) the polling clause unitized leases rather than lands.

**20.** *Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 860 (Tex.2005).

**21.** *Id.*

**22.** *See Southland Royalty,* 249 S.W.2d at 917 (holding that nothing prevented mineral owner "from protecting their estates by express stipulation").

**23.** 198 S.W.3d at 379.

penses on a unit basis.[24]

The record reflects that these expenses were for landman fees, lease bonuses, recording fees, and title opinion expenses, part or all of which related to tracts in the unit other than Sheppard's. Additionally, "overhead" expenses (including administration, supervision, office services, and warehousing) were calculated pursuant to a standard accounting agreement relating to the unit. At trial, Sheppard produced no evidence that any of these expenses were not reasonable and necessary; to the contrary, she stipulated that many of them were.

On appeal, Sheppard suggests no basis for barring these expenses except that they did not all relate to her tract. But the evidence at trial established that two wells could not have been drilled on her tract without the pool, at least not without getting an exception from Railroad Commission that would have curtailed production. From the perspective of other interest holders in the unit, expenses to maintain Sheppard's tract were clearly necessary as all the wells were located there; the same kind of expenses to keep other tracts and leases in the unit were of similar value to Sheppard, not just as a matter of equal treatment but because future wells might be located off her tract.

Although Wagner & Brown's evidence was not contradicted, the trial court was not required to believe all of it. Accordingly, we do not hold that Wagner & Brown conclusively established that all its charges were reasonable and necessary. But some of them certainly were, so there is no evidence to support the trial court's award of none of them. In these circumstances, we must reverse and remand for a reassessment of damages.[25]

### IV. Must Sheppard Pay Drilling Costs?

Sheppard concedes that once her lease expired, she must pay her share of expenses to produce and market gas thereafter.[26] But she argues, and the courts below agreed, that she did not have to pay any of the drilling or other costs incurred before the lease expired.[27]

■■■ But the general rule regarding improvements is otherwise: "The principle is well established in equity that a person who in good faith makes improvements upon property owned by another is entitled to compensation therefor."[28] Thus,

---

**24.** The court of appeals also held that the defendants could not deduct expenses incurred on the first well from the revenues for the second well. *Id.* at 381. As the defendants did not appeal that conclusion, we do not reach it.

**25.** *See Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex.2007); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex.2006).

**26.** *See White v. Smyth*, 147 Tex. 272, 214 S.W.2d 967, 979 (1948) (upholding operating co-tenant's right to assess "payrolls, salaries, depreciation, repairs, insurance, commissions," as well as reasonable compensation for the operator's personal services).

**27.** This dispute appears to relate primarily to the drilling costs of the first well, as the

second well was drilled after Sheppard's lease had terminated, and she does not complain of the trial court's order allowing drilling costs of that well to be deducted from the proceeds she is owed on that well.

**28.** *Sharp v. Stacy*, 535 S.W.2d 345, 351 (Tex. 1976); *see also Resolution Trust Corp. v. Kemp*, 951 F.2d 657, 665 (5th Cir.1992) ("Under Texas law, a purchaser who makes improvements upon property in the good faith belief that it has good title to the property is entitled to compensation for the improvements."); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 10 (Tentative Draft No. 1, 2001) ("A person who improves the real or personal property of another, acting by mistake, has a claim in restitution as necessary to prevent unjust enrichment.").

when a son lost a farm because his deed from his father was oral, we held he might still seek reimbursement for improvements he built to the extent they enhanced the farm's value.[29] When a couple used community funds to build a home on realty owned separately by one spouse, we held the community estate had an equitable right of reimbursement for the improvements.[30] And when a co-tenant paid to raise a lot in Galveston above sea-level, we held he was entitled to reimbursement of his costs.[31] As we explained in the latter case, this rule arises in equity:

> When two persons are cotenants in the ownership of land, and one of them incurs expense in the improvement of the property which is necessary and beneficial, it is equitable that the one incurring the expense shall have contribution from his cotenant in an amount which is in proportion to the undivided interest owned by such cotenant.... The law implies a contract between him and his cotenant, authorizing him to spend for

him the money which was necessarily spent....[32]

Under Texas law, only a naked trespasser cannot recover for improvements that benefit another's land.[33]

As oil and gas wells are improvements to real property,[34] the same rule applies to them: one who drills a well in good faith is entitled to reimbursement.[35] This rule applies even if an operator's lease is not valid, so long as the operator believed in good faith that it was.[36] Similarly, a co-tenant who drills without another co-tenant's consent is entitled to reimbursement:

> It has long been the rule in Texas that a cotenant has the right to extract minerals from common property without first obtaining the consent of his cotenants; however, he must account to them on the basis of the value of any minerals taken, *less the necessary and reasonable costs of production and marketing.*[37]

---

**29.** *See Sharp,* 535 S.W.2d at 351 (holding son's heirs waived that right by submitting issue only regarding costs of improvements rather than enhanced value of farm).

**30.** *Anderson v. Gilliland,* 684 S.W.2d 673, 675 (Tex.1985).

**31.** *Stephenson v. Luttrell,* 107 Tex. 320, 179 S.W. 260, 262 (1915).

**32.** *Id.*

**33.** *Armstrong v. Oppenheimer,* 84 Tex. 365, 19 S.W. 520, 521 (1892).

**34.** *Francis v. Coastal Oil & Gas Corp.,* 130 S.W.3d 76, 85 (Tex.App.–Houston [1st Dist.] 2003, no pet.); *see also Fox v. Thoreson,* 398 S.W.2d 88, 92 (Tex.1966) (referring to costs incurred in drilling and equipping gas well as "improvements").

**35.** *Brannon v. Gulf States Energy Corp.,* 562 S.W.2d 219, 224 (Tex.1977) (holding driller under invalid lease entitled to reimbursement of reasonable drilling expenditures if found to have drilled "in good faith belief in the supe-

riority of its lease"); *Texas Co. v. State,* 154 Tex. 494, 281 S.W.2d 83, 93 (1955) (holding that operator under invalid lease "[a]s a good faith trespasser ... has been permitted credit for its expenditures in producing the oil and gas, according to its own records").

**36.** *Brannon,* 562 S.W.2d at 224 (holding driller under invalid lease entitled to reimbursement of reasonable drilling expenditures if found to have drilled "in good faith belief in the superiority of its lease"); *Texas Co.,* 281 S.W.2d at 93 (holding that operator under invalid lease "[a]s a good faith trespasser ... has been permitted credit for its expenditures in producing the oil and gas, according to its own records").

**37.** *Byrom v. Pendley,* 717 S.W.2d 602, 605 (Tex.1986) (emphasis added); *see also Cox v. Davison,* 397 S.W.2d 200, 201 (Tex.1965) (holding interest not recoverable even if operator borrowed money to drill) ("The Texas rule is that a cotenant who produces minerals from common property without having secured the consent of his cotenants is account-

Thus, there is no question that under Texas law Wagner & Brown could have recovered a share of drilling costs from Sheppard had she signed no lease at all. The question is whether the rule should be different because there was a valid lease that was mistakenly allowed to expire. It is of course true that equity does not favor those who sleep on their rights.[38] But it is hard to see why one who obtains a lease and then loses it by mistake is entitled to less equity than one who by mistake never had a valid lease in the first place.

It is true that C.W. Resources breached Sheppard's lease, but a breaching party is not necessarily barred from reimbursement for improvements. For example, Texas law permits recovery to builders upon substantial performance, even if they have breached their building contract.[39] As we have explained, this rule is based on "the owner's acceptance and retention of the benefits arising as a direct result of the contractor's partial performance." [40]

Beyond these general principles, the parties assert that several cases establish rules in their favor, but we find none convincing. The closest are two 1965 opinions by the Seventh Court of Appeals. In *Thoreson v. Fox*, the court found that a lease had expired for failure to commence production within 120 days, but nevertheless allowed the operator to recover its drilling costs from amounts it owed for gas sales.[41] After quoting a Pennsylvania Supreme Court case allowing reimbursement to an operator who mistakenly drilled on the wrong lease, the Seventh Court stated:

> Surely, if a trespasser, as in the Pennsylvania case just cited, is entitled to recover for the cost of drilling and for machinery and appliances incident to the operation of the well[,] defendants here would be entitled to recover for the value of the improvements to the land itself, limited to the actual cost to the defendants.[42]

Less than three months later, the same court refused to allow reimbursement in *Steeple Oil & Gas Corp. v. Amend*, in which a lease terminated for failure to pay shut-in royalties.[43] The court distinguished *Thoreson* on two grounds: (1) the mineral owner in *Thoreson* invoked equity by seeking an order barring removal of casing and equipment, and (2) a jury found the *Thoreson* operator had acted in good faith.[44] While in some jurisdictions reimbursement for a builder may depend on an equitable counterclaim by the owner,[45] that

---

able to them on the basis of the value of the minerals taken less the necessary and reasonable cost of producing and marketing the same.").

38. *Atl. Ref. Co. v. Noel*, 443 S.W.2d 35, 41 (Tex.1968) (Walker, J., dissenting); *Hanks v. Rosser*, 378 S.W.2d 31, 40 (Tex.1964).

39. *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 481 (Tex. 1984).

40. *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988).

41. 390 S.W.2d 308, 317 (Tex.Civ.App.–Amarillo 1965), *rev'd on other grounds*, 398 S.W.2d 88 (Tex.1966).

42. *Id.*

43. 392 S.W.2d 744, 746 (Tex.Civ.App.–Amarillo 1965), *rev'd on other grounds*, 394 S.W.2d 789 (Tex.1965).

44. *Id.*

45. *See* RESTATEMENT (FIRST) OF RESTITUTION § 42(1) (1937) ("Except to the extent that the rule is changed by statute, a person who, in the mistaken belief that he or a third person on whose account he acts is the owner, has caused improvements to be made upon the land of another, is not thereby entitled to restitution from the owner for the value of such improvements; but if his mistake was reasonable, the owner is entitled to obtain

does not appear to have been the general rule in Texas.[46] Nor is it clear why the failure to pay shut-in royalties in *Steeple* was not in good faith while the failure to commence timely production in *Thoreson* was. In any event, both opinions were promptly reversed by this Court on other grounds.[47]

Almost 80 years ago, the Commission of Appeals held in *Broadway v. Stone* that a plaintiff who bought an unleased 1/36th mineral interest after four producing wells had been drilled "was chargeable in equity with a proportionate part of the reasonable value of said improvements." [48] While the Commission said that production after the plaintiff's purchase should be reduced by expenses incurred *after* that date, it also held that such production was "subject to the charge for improvements" made *before* that date.[49] But as *Broadway* did not involve a terminated lease, and was approved by this Court only as to its holding

rather than its reasoning,[50] it is not controlling here.[51]

One cannot conclude much from this limited set of cases, except that operators apparently do not let many productive leases expire before recovering their drilling costs. Given the equitable nature of a reimbursement-for-improvements claim,[52] we decline to read Texas law as establishing that drilling costs are *always* or *never* recoverable when a lease expires.

▮▮▮▮ Instead, we believe the equitable nature of such claims must turn on the equities in each case. Thus, for example, an operator who intentionally terminates a lease has a weaker claim to equity than one who does so by accident. One who immediately offers to reinstate an expired lease has cleaner hands than one who does not. As with other equitable actions, a jury may have to settle disputed issues about what happened, but "the expediency, necessity, or propriety of equitable relief"

judgment in an equitable proceeding or in an action of trespass or other action for the mesne profits only on condition that he makes restitution to the extent that the land has been increased in value by such improvements, or for the value of the labor and materials employed in making such improvements, whichever is least.").

**46.** See *Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex.1985) (upholding right of reimbursement although opposing party made no equitable claims); *Stephenson v. Luttrell*, 107 Tex. 320, 179 S.W. 260, 262 (1915) (same).

**47.** See *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex.1966) (holding lease never terminated, so question of offset was moot); *Steeple Oil & Gas Corp. v. Amend*, 394 S.W.2d 789, 790 (Tex.1965) (reversing and dismissing appeal as underlying summary judgment was interlocutory).

**48.** 15 S.W.2d 230, 232 (Tex. Comm'n App. 1929, holding approved).

**49.** *Id.*

**50.** See TEXAS RULES OF FORM (Texas Law Review Ass'n et al. eds., 10th ed. 2005) ("The Texas Supreme Court's approval of the holding of a commission decision signifies that the Court approved the judgment and adopted each specific holding of the Commission, but did not necessarily approve its reasoning.").

**51.** Because the Thirteenth Court of Appeals read *Broadway* to allow recovery only of—purchase costs without noticing the Commission's holding that pre-purchase costs were also chargeable, we find its opinion in *Hunt v. HNG Oil Co.* unconvincing. See 791 S.W.2d 191, 194 (Tex.App.–Corpus Christi 1990, writ denied). Nor do we find applicable the refusal to award recovery of drilling costs in *Eubank v. Twin Mountain Oil Corp.*, 406 S.W.2d 789, 792 (Tex.Civ.App.–Eastland 1966, writ ref'd n.r.e.), as the lease had not only expired but failed to produce anything for five years, so the improvements were no longer benefiting the mineral estate owner.

**52.** See *Broadway*, 15 S.W.2d at 232; *Stephenson v. Luttrell*, 107 Tex. 320, 179 S.W. 260, 262 (1915).

is for the trial court,[53] and its ruling is reviewed for an abuse of discretion.[54]

Based on the summary judgment record here, it appears that the trial court abused its discretion in refusing reimbursement of drilling costs. There is no question Sheppard's tract has enjoyed ten years of production from two gas wells drilled at the sole risk and expense of the defendants. Neither well was drilled by a trespasser; the defendants had title to the other 7/8ths of the minerals on her tract, and thus an unquestionable right to drill the wells where they were. Sheppard had the option to continue collecting royalties free of any drilling costs, as Wagner & Brown offered to reinstate her lease on that basis. Having chosen instead (as was her right) to be a co-tenant with full benefits to the minerals she owned, it would be inequitable to allow her to escape the burdens that come with that choice.

 Further, it is well-settled that "equity abhors forfeiture."[55] Consistent with that rule, Texas law requires that in construing mineral leases "doubts should be resolved in favor of a covenant instead of a condition" so that forfeiture is avoided.[56] Sheppard's lease leaves no room for doubt that the operators forfeited the lease when the first royalty was delayed; but it says nothing about whether they forfeited drilling costs too on that basis. While the defendants lost forever their legal claim to Sheppard's minerals, that does not necessarily mean that they also lost their equitable claim for the improvements they had built on her tract. Again, equity might deny such a claim had the lease expired long after production had begun and the operators had recovered most of their drilling costs. But the lease here terminated at the very outset of production, so denying reimbursement would work a substantial forfeiture. Under the facts in the record here, the trial court abused its discretion by allowing Sheppard to reap all the proceeds of production without bearing any of the costs.

The court of appeals denied reimbursement on the basis that Sheppard was a royalty owner at the time drilling costs were incurred, and thus was not liable for them.[57] But Sheppard ceased being a royalty owner shortly after production began. To the extent working interest owners paid drilling costs out of production over the following months, Sheppard too would be liable for those costs as she became a working interest owner after her lease terminated.[58]

53. *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex.1979); *see also Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex.1999) (holding forfeiture of attorney's fee was equitable decision for trial court); *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974) (holding equitable remedy of constructive trust was for trial court).

54. *See, e.g., Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex.2007) (reviewing constructive trust for abuse of discretion); *Lee v. Downey*, 842 S.W.2d 646, 649 n. 9 (Tex.1992) (reviewing denial of permanent injunction for abuse of discretion); *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex.1988) (reviewing marital equitable reimbursement claim for abuse of discretion).

55. *Jones v. N.Y. Guar. & Indem. Co.*, 101 U.S. 622, 628, 25 L.Ed. 1030 (1879) ("A court of equity abhors forfeitures, and will not lend its aid to enforce them."); *see, e.g., Bennett v. Copeland*, 149 Tex. 474, 235 S.W.2d 605, 608 (1951); *Hoover v. Gen. Crude Oil Co.*, 147 Tex. 89, 212 S.W.2d 140, 143 (1948); *Slaughter v. Qualls*, 139 Tex. 340, 162 S.W.2d 671, 676 (1942); *Ft. Worth Driving Club v. Ft. Worth Fair Ass'n*, 103 Tex. 24, 122 S.W. 254, 254 (1909).

56. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex.1989).

57. 198 S.W.3d at 377.

58. *See Westbrook v. Atl. Richfield Co.*, 502 S.W.2d 551, 554 (Tex.1973) (holding mineral owners whose lease had expired signed unit agreement as working interest owners).

Because of the absence of authoritative caselaw, the evidence presented in the parties' cross-motions for summary judgment did not focus on the equitable issues like those we have indicated above. We recognize there might be other facts not appearing in the record that would justify denying Wagner & Brown an equitable right of reimbursement for drilling or other pre-termination costs. Accordingly, in the interest of justice we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.[59]

\* \* \*

For the reasons stated above, we reverse the judgment of the court of appeals, and render judgment that (1) termination of Sheppard's lease did not terminate her participation in the Landers unit, and (2) Wagner & Brown may account for both production and costs on a unit basis to the extent allowed by the parties' agreements, custom in the industry, and the trial court's order that operating expenses be deducted from production on a well-by-well bases (from which order the defendants have not appealed). We reverse and remand for further proceedings in the trial court consistent with this opinion regarding (1) the reasonable and necessary costs of production to be deducted from amounts due Sheppard for costs incurred after termination of her lease, (2) whether the defendants are entitled to equitable recovery of their pre-termination costs, and if so (3)

the reasonable and necessary amount of those costs.

Justice WILLETT did not participate in the decision.

---

**59.** Tex.R.App. P. 60.3; *see R.R. St. & Co. v. Pilgrim Enters., Inc.,* 166 S.W.3d 232, 255 (Tex.2005); *Humble Sand & Gravel, Inc. v. Gomez,* 146 S.W.3d 170, 195 (Tex.2004).